DORCAS CASWELL *vs.* BOSTON & WORCESTER RAILROAD COR-
PORATION.

If the station-house of a railroad company is separated by a side track from a platform pro-
vided for passing to the trains, and there are no regulations or directions as to when or how
passengers shall pass to them, the question whether a passenger is bound to wait in the
station-house until the arrival of a train at the platform, or may go to and stand on the
platform during its approach, depends on what is a reasonably safe and prudent course for
him to adopt, in determining which it is proper for a jury to consider what is the usage
of passengers there, and whether such usage is known to and permitted by the company.

If, by displacement of a switch by a servant of a railroad company, a train due over the
main track of the railroad is diverted to a side track, and comes into collision there with
other cars, and puts in peril passengers on an adjoining platform, it is competent for a
jury to find that the omission to replace the switch was culpable negligence·

A passenger on a railroad, while standing in a proper place to await the arrival of a train,
having reason to believe, by the conduct of servants of the railroad company and pas-
sengers also standing there, that she was in imminent peril from the approach of the train
in an unexpected direction by reason of the displacement of a switch through culpable
negligence of servants of the company, became alarmed, and, in running away to escape
the apprehended peril, fell and was injured. In an action by her against the company for
damages for the injury, *Held*, that the jury were warranted in returning a verdict against
the company, although the course which the plaintiff took in running off brought her
into greater peril from the approach of the train than she would have been in had she re-
mained where she was standing, and although the immediate cause of her fall was her
tripping over the rail of the track on which she was running.

TORT for injuries by a fall alleged to have been caused by
negligence of the defendant corporation.

The declaration alleged that on July 28, 1865, the plaintiff
bought a ticket at Wellesley station, on the defendants' railroad,
for transportation of herself from there to Boston; and while
she was waiting, as a passenger, under the defendants' direction
and control, upon a platform provided by them for the use of
passengers waiting to be conveyed from Wellesley to Boston, a
switch was so carelessly managed by their servants, that the ap-
proaching train left its usual and safe track for a side track im-
mediately connected with the platform, by reason whereof she,
being all the time in the exercise of due care, suddenly left the
platform, on account of apprehension of imminent danger to
her life and limb from the train, and in so doing fell·and received
the injuries in question.

The answer denied that the plaintiff, while standing on the

platform, was under the defendants' direction and control, and alleged that, being there in a position perfectly safe, she carelessly left it, and in running off fell, and that any injuries caused thereby were the result of her own negligence; and they denied negligence in the management of their switch.

Trial in this court, before *Foster*, J., who allowed a bill of exceptions containing a recital of the testimony, by which the facts appeared substantially as follows:

The Wellesley station was situated on the south side of the defendants' railroad, and a platform was built out from the north side of the station-house. The track adjoining this platform was a side track, separated by what was called at the trial "the middle platform" from the double track over which the passenger trains ran to and from Boston; so that the direct and convenient course for passengers, in order to go from the station-house to the Boston trains, was to cross this side track to the middle platform and step from that upon the train. There was no usage on the part of the company to give any notice to passengers of the approach of the train for Boston, nor any regulations or directions of the company concerning when and how passengers should enter it, or where they should remain while waiting for it; but, some distance west of the station-house, there was a curve in the railroad, in coming around which the engineer of the train was accustomed to blow his whistle, and it was the usage for the passengers on hearing it to cross from the station-house and its platform over to the middle platform, and there await the arrival of the train. The defendants' servants at the station were Edward Perry, the station master; and Rufus Campbell, who received the luggage, sawed wood, managed the lanterns, and did chores.

About ten minutes before eight o'clock on the morning of the day alleged in the declaration, the plaintiff, who was a widow seventy-four years old, in company with her son, Asa Caswell and his wife and two children, reached the station, where Mr Caswell bought for the party, from the station master, three tickets for Boston, intending to take the train which would be due from the west at eight o'clock. Then the ladies waited in the

station-house, and Mr. Caswell on the platform projecting from it, until the whistle was blown at the curve, when the whole party crossed over to the middle platform, numerous other passengers crossing at the same time, so that from twenty-five to thirty persons were assembled there, and among them Perry and Campbell.

The plaintiff testified: " I had a small basket and a parasol. On the platform I saw cars and heard a strange whistle, and in a moment some one said, ' Take care, I think we're in danger,' so loud that I heard it. I started and tried to cross the track. I ran, I think, I was so excited and frightened. I think I fell down I don't know how I fell. My arm was right out straight."

By the testimony of other witnesses the manner of the plaintiff's alarm and flight and fall appeared substantially as follows:

At seven o'clock on the same morning a freight train, on its way from Boston to Worcester, had stopped at Wellesley to leave a coal car. For this purpose the switch between the side track and the main road was reversed; and it was not restored to its former position after the car was left and the freight train moved on. By the testimony of the president of the railroad, it appeared that it was the duty of " whoever took the train over " the switch, to close it afterwards, " unless some one was there who, he would have reason to believe, would do his duty, to facilitate business," and that " no man could open and leave a switch without some one to take care of it, if they both did their duty." And by the testimony of the conductor of the freight train it appeared that he unlocked and shifted the switch in order to leave the car, and, as Campbell was there present and helping, supposed that he would shift it back again, as he had done " usually " before, and so went off without seeing to it himself.

When the eight o'clock passenger train was turning the curve west of the station, the engineer, after giving the " station whistle " indicating his approach, first saw that the target of this switch was in a wrong position, and at once gave the signal (a short whistle) to apply the brakes, and reversed his engine

There was conflicting testimony as to the rate of speed at which his train was then moving, and also as to the rapidity with which it slackened speed. He himself declined to swear that it was not moving at that time as fast as twenty miles per hour, but thought that the rate was very much less, and as it neared the station-house was "not much over four miles an hour."

About the time this whistle to break was heard by the persons assembled on the middle platform, the fact was recognized among them that there was some mistake about the switch. Campbell, who was holding the mail-bag, cried out, "Engine is on the wrong track; switch is wrong; look out for yourselves." Others also cried out, "Take care of yourselves. Danger! Engine has gone off a switch." And there was testimony that Perry exclaimed in a loud and excited voice, "Switch is wrong; take care of yourselves;" but he denied this, and testified that he told the passengers on the middle platform "to stay there, as it was safe," though it appeared that he left it himself, and went across the side track to the platform adjoining the station. The passengers generally ran off in various directions in great excitement and confusion. Mr. Caswell took hold of his wife's dress, and the children of her hands; and they jumped down from the north side of the middle platform, and crossed the double track to a third platform beyond it. The plaintiff, however, jumped down from the south side of the middle platform, and ran diagonally across the side track. The engine of the passenger train, which by the misplacement of the switch was diverted to the side track, struck, and broke in, with a loud crash, the end of a baggage car which was standing there, and drove it against another baggage car beyond, and threw it partly off the track, scraping and splintering the platform in front of the station-house, and tearing up the planking between it and the middle platform. Just at this moment, one of the passengers, observing the plaintiff running on the side track in front of these cars, which the advancing train was forcing along, called to her to step off from it; and she did so, and immediately fell, dislocating her shoulder; and the cars, forced along by the engine, passed the place where she stumbled. There was testimony tending to show that the

immediate occasion of her fall was the hitching of her foot against, or her tripping over, the rail or one of the sleepers of the side track. After the train had passed by, she was helped to get upon her feet by one of the witnesses of her fall.

The defendants requested the judge to rule that the evidence was not sufficient to support the plaintiff's action ; but he declined to do so. They then presented certain prayers for instructions to the jury, the first of which was :

" 1. That the plaintiff before entering the cars was not under the defendants' charge, so as to render them responsible for any injury she might suffer from the position in which she voluntarily and unnecessarily placed herself; that it was her duty to remain in the room or building where the defendants received passengers for transportation, until the proper time came for her to take her seat; and that, if she left such room or building before the train was ready for her reception, and thus placed herself in a dangerous position which she would otherwise have avoided, the defendants were not responsible, although the misplacing of the switch might have led to such danger; that the fact that passengers, without request or direction from the defendants, did then, or had previously frequently gone upon the platform, on which she was, before the arrival of the train, and before it was ready to receive passengers, did not vary the liability of the defendants ; that if the position in which she stood on the platform was in fact reasonably safe and secure, and the injury she received was occasioned by her leaving such position, she could not recover."

This instruction the judge refused to give ; but he did give the three other instructions prayed for, which were as follows :

" 2. That if the plaintiff went upon the track unnecessarily into a more dangerous position than that she occupied before, and in escaping from that position stumbled and fell, through her hurry and confusion, occasioned wholly or in part by her being in that position, she could not recover; that, even if the defendants were guilty of negligence in regard to the switch, if such negligence was not so far conducive to the injury the plaintiff sustained as to create such a reasonable degree of alarm and

apprehension in her mind as rendered it necessary for her to leave the platform in order to avoid immediate danger, the action was not maintainable; that it was necessary, in order to sustain this action, for the plaintiff to show that she was placed, by the misconduct of the defendants, in such a situation as obliged her to adopt the alternative of a dangerous departure therefrom, or to remain at certain peril; that the question is whether she was placed in such a situation as to render what she actually did a prudent precaution for the purpose of self-preservation; whether her act in passing upon and down the track on which the train was coming, and in front of the cars, was the measure of an unreasonably alarmed mind, or such as a reasonable and prudent mind would have adopted; whether the misplacing of the switch created a necessity for what the plaintiff actually did, and whether she used proper caution and prudence in taking the course she did to extricate herself from an apparently impending and real peril, creating a reasonable cause for alarm in the position in which she was.

"3. That if the plaintiff was of such an age and condition as to require the care and assistance of her son, and was under his care and charge, and there was any want of ordinary care on his part in directing her movements, or in omitting to assist or direct her, this would have the same effect as any want of ordinary care on her part; but if otherwise, and if her right to maintain this action is not affected by any act or omission of her son, then the measure of care and prudence required of her would be no less than that required of persons of ordinary sense, competence, prudence, and physical and mental capacity.

"4. That if the injury occasioned through the plaintiff's falling (after she had passed the track, and was on the level ground beyond, and in a safe position) was from her being incumbered with articles that she was carrying, entangled in her dress, or by being helped up by another person, or other similar cause not connected with the defendants, they would not be liable in this action."

And the judge further instructed the jury " that the burden of proof was upon the plaintiff to establish to their reasonable

satisfaction all the facts necessary to enable her to maintain the action; that the first question was, whether the omission to replace the switch was culpable negligence on the part of the agents of the railroad company; that the defendants, as common carriers, were bound to use towards their passengers the utmost care to provide them with reasonably safe and convenient ways of access to their trains; that, after the plaintiff's son had purchased for her a ticket for a particular train which she was on the premises of the company waiting to take, and while she was passing from the depot where the ticket was bought to enter the cars, she was entitled to the rights and protection of a passenger; that the question whether she was bound to wait in the depot until the train arrived, or was, as a passenger, at liberty to go to and stand on the platform while it was approaching, in the absence of any regulations or directions on the subject by the company or its agents, must depend upon what was a reasonably safe and prudent course for her to adopt; that the jury might consider whether it was the usual custom of passengers to place themselves on the platform before the train arrived and stopped; and whether this custom was well known to and permitted without objection by the agents of the company, in determining whether it was actually safe and prudent for the plaintiff to do so; that there was no rule of law that passengers must wait in the station and not go upon the platform till the train had stopped, or that they must be ready and waiting there upon its arrival; and, in the absence of any rule or direction by the company, due care and reasonable prudence were the measure of the plaintiff's duty; that the jury must inquire whether the plaintiff, when upon the middle platform, was in a place where she had a right to be at the time, and whether her position there could have been one of reasonable safety and security but for the fault of defendants' agents in leaving the switch misp aced; and that, if these facts should be found in favor of the plaintiff, the next inquiries of the jury should be, whether the place which the plaintiff occupied, and which would otherwise have been safe and proper, was made dangerous by the fault of the company in leaving the switch misplaced, and whether the

plaintiff, while using due care, was placed in a position of actual and not fancied peril by the fault of the defendants; that this would not necessarily depend upon the fact that if she had remained on the platform she would not have been injured, as the event showed, but that, to entitle her to recover, it must appear that she was in real, actual and imminent danger where she stood on the platform."

And the judge further instructed them " that, if these facts should be satisfactorily established, they were next to inquire whether, in endeavoring to escape, the plaintiff conducted herself with ordinary and reasonable prudence and discretion : whether her course in running away instead of remaining, and in the direction she took, was a reasonable precaution to avoid actual danger, such as persons of common prudence and discretion would naturally take or be likely to take under the same circumstances ; and that, if there was any want of common or ordinary care, prudence or discretion in her own conduct, which contributed to the injury, she could not recover, however great the defendants' fault ; that, if she became frightened and confused to a greater degree than a person of ordinary and reasonable prudence, self-control and intelligence would have been, and in consequence of her alarm and confusion took a more dangerous course, when one of greater safety was open to her, then she could not recover; that it must appear that, under all the circumstances in which she was placed, her conduct and the course she pursued was a natural, proper and prudent precaution for the preservation of her life."

And finally he instructed them " that, if these facts were established, and the plaintiff met with an injury while trying to escape from a real and not imaginary danger, and using due care in the mode by which she attempted to escape, and if the injury would not have happened but for the defendants' fault, and did happen by reason of it, without want of care on her part while she was on the track or directly after she left it, and before she was out of actual danger, then she might recover, although the immediate cause of the injury might have been the striking of her foot on the rail or sleeper while running, and although she

would not have been hurt if she had stayed on the platform."

The defendants also requested the judge to direct the jury to find specially where the plaintiff fell, upon or outside of the track; but he refused to do so.

The jury returned a verdict for the plaintiff, assessing damages in the sum of $2187.50; and the defendants alleged exceptions.

*G. S. Hale,* for the defendants. 1. The most favorable view of the whole evidence for the plaintiff is, that, before the train arrived, she left a safe position provided for her, passed over a side track which the defendants had a right to use, placed herself, without invitation, direction or request from the defendants, on a platform from which passengers were to enter the cars on their arrival, in a position more exposed than the other, but where passengers were accustomed to place themselves before such arrival; that, by the negligence of the defendants, their train came upon the side track and produced the danger to which her position was potentially liable; and that in escaping from this danger she was injured by a fall not occasioned directly by the danger sought to be avoided. The principle on which her claim rests must be that she was placed by misconduct of the defendants in such a situation as obliged her to adopt the alternative of a dangerous passage over the track or to remain at certain peril. *Jones* v. *Boyce,* 1 Stark. 493. *Stokes* v. *Saltonstall,* 13 Pet. 181. *Ingalls* v. *Bills,* 9 Met. 1. But in each of these cases the plaintiff was in a vehicle which the defendant alone controlled, and in the only position which the provision made by the defendant permitted him to occupy.

2. In *Warren* v. *Fitchburg Railroad Co.* 8 Allen, 227, it was decided that it is the duty of a railroad company to afford to passengers a reasonable and safe opportunity to "pass" from the station-house to the cars "when the proper time comes for them to take their seats," but the company is not held bound to make the way of reaching the trains the safest possible, nor safe at any other time or for any other purpose than the time and purpose at or for which it is necessary to use it, nor to interpose

barriers, make regulations or give notice to prevent possible exposure, but only to exercise the highest degree of care consistent with their undertaking, in providing for the passenger safe and convenient means of access to the train "while proceeding to take his seat." In the present case the plaintiff was not under the direction of the defendants' agents. She was not " proceeding to take her seat" or " passing" to the train. The " proper time" had not come for her to take her seat. She was simply waiting in a position selected by herself, outside of the station-house, (where a room was provided for her accommodation,) on a platform not intended for a resting place, but only to pass over; and the custom of others to occupy it was immaterial. The presumption that a train is always coming on a railway applies to a side track as well as to the main road. The principle of *Todd* v. *Old Colony & Fall River Railroad Co.* 3 Allen, 18; 7 Allen, 207, governs this case, that " to occupy exposed positions which have not been provided or designed for such occupation" will prevent the recovery of damages. See also *Galena & Chicago Union Railroad Co.* v. *Yorwood*, 15 Ill. 468; *Pennsylvania Railroad Co.* v. *Zebe*, 33 Penn. State, 318, 327; *Raymond* v. *Lowell*, 6 Cush. 524; *Lucas* v. *New Bedford & Taunton Railroad Co.* 6 Gray, 64, 72; *Ohio & Mississippi Railroad Co.* v. *Gullett*, 15 Ind. 487. The judge's instruction leaving to the jury the question whether the plaintiff was " as a passenger" at liberty to go and stand on the platform, and whether it was " the usual custom of passengers to place themselves on the platform before the train arrived," extended the liability of the defendants beyond the limits drawn in *Warren* v. *Fitchburg Railroad Co.*, and held them bound to the utmost care in making safe at every time every place where passengers might wait without necessity or direction, the only qualification suggested being that it should be a place " on the platform," and a time while the train " was approaching"

3. The jury were left free to understand, from the instructions, that the mere displacement of the switch would render the defendants liable if it made her position dangerous. But the defendants had a right to run a train over the side track then and

there, if they exercised due diligence in so doing ; and whether it got on the side track by accident or design, carelessly or carefully, was not the test of liability. *Indiana Central Railroaa Co.* v. *Hudelson*, 13 Ind. 225. They having the right to use their side track at any time, there was no duty on them to replace their switch ; and it was therefore incorrect to leave to the jury the question " whether the omission to replace it was culpable negligence."

*G. A. Somerby*, for the plaintiff, was stopped by the court.

BIGELOW, C. J. We are of opinion that the instructions in this case were well adapted to the facts in evidence, and were in all respects sufficient to give the jury an adequate understanding of the rights and duties of the defendants. We do not see that they do not in all essential particulars conform to the principles stated with great accuracy and fulness in *Warren* v. *Fitchburg Railroad Co.* 8 Allen, 227.

The evidence was sufficient to warrant a jury in finding, 1. that the plaintiff seasonably and without undue haste passed across the track of the railroad, and took a proper position on the platform provided by the defendants for passengers who were about to take the train that was approaching ; 2. that, while standing there in a suitable place, where passengers were accustomed to be in order to enter the train, she had good reason to believe that she was in actual peril of injury by reason of the approach of an engine in an unexpected direction, in consequence of the displacement of a switch ; 3. that this reasonable apprehension of peril and injury was adequate and sufficient to excite alarm, and to induce the plaintiff to make efforts to escape as rapidly as possible ; 4. that this displacement of the switch and the consequent approach of the engine in such manner as to excite alarm and apprehension of injury were owing to the culpable negligence of the servants of the defendants and 5. that this negligence was the efficient cause of the plaintiff's injuries.　　　　　*Exceptions overruled.*